UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION


WOLF LAKE TERMINALS, INC. and )
TANCO TERMINALS, INC.,        )
                              )
            Plaintiffs        )
                              )
        v.                    )   Case No. 2:04 cv 89
                              )
MUTUAL MARINE INSURANCE       )
COMPANY, a/k/a MUTUAL MARINE  )
OFFICE, INC. or UTICA MUTUAL  )
INSURANCE COMPANY and NEW YORK )
MARINE MANAGERS n/k/a SOMERSET )
MARINE, INC.,                 )
                              )
            Defendants        )


<u>OPINION AND ORDER</u>

This matter is before the court on the Updated Motion for

Summary Judgment filed by the plaintiffs, Wolf Lake Terminals,

Inc. and Tanco Terminals, Inc., on April 14, 2005; the Motion For

Summary Judgment filed by the defendants, Mutual Marine Insurance

Company and Somerset Marine, Inc., on May 16, 2005; the Motion

for Default Judgment against Defendant Mutual Marine Insurance

Company filed by Wolf Lake and Tanco on June 21, 2005; and the

Motion to Strike Affidavits and Exhibits Submitted by Defendants

in Opposition to Plaintiffs' Motion for Summary Judgment filed by

Wolf Lake and Tanco on June 21, 2005.  For the reasons set forth

below, the cross-motions for summary judgment are **GRANTED IN PART**

and **DENIED IN PART,** the motion for default judgment is **DENIED,**

and the motion to strike is **GRANTED IN PART** and **DENIED IN PART.**

## Undisputed Facts

The following facts are undisputed.  The plaintiffs, Wolf Lake Terminals, Inc. and Tanco Terminals, Inc., are related companies in the business of bulk liquid storage.  (Aff. of Ewell "Woody" Long, $\partial 2$) Tanco operated a business at the former Phillips bulk storage facility in Milwaukee, Wisconsin from 1981 to 1993.  (Long Aff. $\partial 5$) Wolf Lake, located in Hammond, Indiana, is an ongoing business.  (Long Dep. pp. 3-4)

From April 1, 1980 to June 30, 1983, Mutual Marine Insurance Company provided comprehensive liability insurance coverage to Wolf Lake and Tanco Terminals.  (Pl. MSJ Exhs. H, J) These policies were occurrence based, meaning that insurance coverage attached at the moment of an "occurrence," though a claim related to that occurrence could be made later.  (Long Aff. Attach. 5 1981-82 policy, $\partial 5$) From June 30, 1983 to June 30, 1994, Somerset replaced Mutual Marine as the insurer of Wolf Lake and Tanco and issued occurrence based policies.  (Long Aff. Attach. 5) All of the occurrence based policies issued by the defendants provide "all sums" coverage with a $1 million coverage limit.[1]  The

---

[1] For example, the 1981-82 policy provides coverage for: "100% interest in the legal and/or assumed liability of the Assureds arising out of the premises and/or operations . . . (b) For all sums which the Assureds shall become obligated to pay (a) as damages because of bodily injury, personal injury or death sustained by any person; (b) as damages for the loss of use of the property of others as well as damages because of injury to, loss of, or destruction of, the property of others; and (c) as expenses for removal of the spill of a pollutant caused by accident. . . . (d) The cost of defending and investigating any suit against the Assureds on any claim based on a liability or an alleged liability of the Assureds covered by this insurance shall be payable by the Assurers if the amount of the claim hereunder exceeds the retained limits under this policy, but the Assurers shall not be liable for costs or expense of prosecuting or defending any suit unless the same shall have been incurred with the written consent of the assurers.  These Assurers, however, reserve the right to conduct the defense of any actions or suits at their own expense.

(Long Aff. Attach. 5, 1981-82 policy at $\partial 3$)

Mutual Marine policies from April 1980 to June 1983 have a $5,000 deductible for the defense of each occurrence, a $75,500 per occurrence deductible for pollution claims, and $25,000 per occurrence deductible for all other claims. (Long Aff. Attach. 5)

From 1994 to 1997, Somerset continued to insure the Wolf Lake and Tanco sites under "claims-made" policies. The plaintiffs' claims on the claims-made policies were dismissed by order of the court on November 24, 2004, which was affirmed in relevant part on reconsideration on April 4, 2005. Thus, only the 1980-1994 occurrence based policies are at issue here.

Fluids Engineering Corporation ("FEC") began storing hazardous waste in tanks 31, 32, and 37 at Wolf Lake in October 1980. (Agreed Order of Wolf Lake and Indiana Department of Environmental Management ("IDEM"), p. 2) Rapid Liquid Waste ("RLW") obtained a permit to operate a hazardous fuel blending operation in tanks 23 and 26 at Wolf Lake on June 15, 1981.[2] (Agreed Order, p. 3) When FEC and RLW became insolvent and abandoned the hazardous material in these tanks, the United States Environmental Protection Agency ("EPA") and IDEM pursued Wolf Lake under the Resource Conservation and Recovery Act ("RCRA"). (Long Aff. ∂4)

On February 27, 1989, the EPA and IDEM issued a notice of violation for tanks 23, 26, 31, 32, and 37. (Long Aff. ∂3;

_____

[2] The plaintiffs have submitted affidavits indicating that RLW was performing this operation at Wolf Lake as early as the 1970s. (*See* Aff. of Michael Palm, ∂4; Supplemental Aff. Long, ∂3) The precise date blending operations began is irrelevant, as the parties do not dispute that as of 1981, RLW was using tanks 23 and 26.

Agreed Order, p. 3) Wolf Lake entered into an Agreed Order with
IDEM in June 1994, which was approved on August 1, 1994, and an
administrative order with the EPA in 2000 regarding these claims.
(Agreed Order; Long Aff. ∂4) In a letter sent May 26, 2000 to
Somerset only, Wolf Lake notified "all Insurers" in writing of
the EPA's claim at Wolf Lake.  (Long Aff. Attach. 6; Def. State-
ment of Facts in Supp. MSJ ∂7 (incorporating Exh. H of the
Complaint)) Immediately thereafter, Somerset hired the law firm
of Beckman, Kelly & Smith, which then issued a reservation of
rights letter on behalf of Somerset on May 30, 2000.  (Aff. of
Raymond J. Weisse, ∂7; Long Aff. ∂7) Upon the discovery that
Somerset and Mutual Marine were not the same company, Wolf Lake
notified Mutual Marine in writing of the consent agreement on
June 8, 2000.  (Comp. Exh. H)[3] On October 25, 2000, Mutual Marine
also notified Wolf Lake that it had not "provided sufficient
[sic] to demonstrate compliance with the terms and requirements"
of the 1981-83 insurance contracts.  (Long Aff. Attach. 8, p. 1)
On June 30, 2003, counsel for Wolf Lake again notified Beckman,
Kelly & Smith of the claims.  (Long Aff. Attach. 9)

The Wisconsin Department of Natural Resources ("DNR")
notified Tanco of its liability for contamination at the Milwau-
kee facility on November 10, 1993.  (Long Aff. Attach. 3) On
January 31, 1994, Tanco notified Johnson & Higgins of the insur-
ers' liability under all insurance policies "May 1981 to pres-

---

[3] Although the defendants' statement of facts says that Tanco supplied
this notice, the exhibit itself indicates that the notice only referenced Wolf
Lake.

4

ent."  (Long Aff. Attach. 10) However, on August 2, 1994, Tanco expressly withdrew its demand for defense and indemnification under these policies.  (Long Aff. Attach. 10) On June 30, 2003, Tanco renewed its request for coverage in the letter sent to Beckman, Kelly & Smith.  (Long Aff. Attach. 9) At that time, Beckman, Kelly & Smith represented Somerset, but not Mutual Marine.  (November 24, 2004 Order, p. 3) Thus, the first time Mutual Marine learned of Tanco's intent to exercise its rights under the 1980-83 policies, after the withdrawal of the request for defense and indemnification, was when this suit was filed on February 27, 2004.

Neither Mutual Marine nor Somerset assisted the plaintiffs in the handling of the enforcement claims and neither has paid for the plaintiffs' legal defense or clean-up costs.  (Long Aff. $\partial 7$; Long Supp. Aff. $\partial 5$) On May 25, 2004, the plaintiffs filed an amended complaint seeking reimbursement for the indemnification and defense costs incurred during the course of the environmental remediation at the two sites, prejudgment interest, and attorneys' fees related to this action.  In addition to the cross motions for summary judgment, the plaintiffs have filed a motion for default judgment against Mutual Marine and a Motion to Strike certain affidavits and exhibits.

<u>Discussion</u>

### I.  Motion for Default Judgment

Federal Rule of Civil Procedure 55(a) governs the entry of default and default judgment.  When a defendant fails to answer a

5

complaint or otherwise defend itself, the clerk can make an entry of default.  Rule 55(a).  *See also Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980) ("Once a defendant fails to file a responsive answer, he is in default, and an entry of default may be made by either the clerk or the judge.").

Entry of default must precede an entry of default judgment. *See, e.g., Hirsch v. Innovation International*, No. 91 Civ. 4130, 1992 WL 316143, at *1 (S.D.N.Y. Oct. 19, 1992).  Although Rule 55(a) refers to the entry of default by the clerk, "it is well-established that a default also may be entered by the court." *Breuer Electric Manufacturing Company v. Toronado Systems of America, Inc.*, 687 F.2d 182, 185 (7th Cir. 1982); *Jackson*, 636 F.2d at 835.

In the instant case, the clerk has not made an entry of default.  When deciding a motion for entry of default judgment, if there is no entry of default by the clerk, the court can treat such motions as requests for both: (1) an order to the clerk to enter the default; and (2) entry of default judgment.  *Hirsch*, 1992 WL 316143, at *1.  Therefore, the court will consider the plaintiffs' motion as a petition for entry of default and a default judgment.

When a party applies for judgment by default under Rule 55(b)(2), "the district judge is required to exercise sound judicial discretion in determining whether the judgment should be entered."  Wright & Miller, *10A Federal Practice and Procedure 3 ed.* ß2685 (1998).  In determining whether to enter a default

judgment, the court may consider a number of factors including
whether there is a material issue of fact, whether the default is
largely technical, whether the plaintiffs were substantially
prejudiced, and how harsh an effect a default judgment might
have.  Wright & Miller, ß2685.

The plaintiffs argue that default judgment should be entered
against Mutual Marine for its failure to answer the amended
complaint.  On May 28, 2004, Mutual Marine and Somerset filed a
motion to dismiss the amended complaint which was granted in part
and denied in part on November 24, 2004, and upon reconsideration
on April 4, 2005.[4]  Thereafter, Federal Rule of Civil Procedure
12(a)(4) required Mutual Marine to file an answer within 10 days
of the court's ruling.  *See **Becker v. Fitzgerald**, No. 94 C 7646,
1995 WL 215143, at *2 (N.D. Ill. Apr. 10, 1995).  However, Mutual
Marine did not file an answer until June 28, 2005, approximately
ten weeks late.

Aside from the tardiness in filing an answer, Mutual Marine
otherwise has defended this case vigorously since its inception.
Mutual Marine has attended all status conferences, actively
participated in discovery, and fully briefed all pending motions.
In addition, the Standards for Professional Conduct Within the
Seventh Judicial Circuit state that attorneys practicing in this

---

[4] The plaintiffs argue that the court denied the motion to dismiss "in
its entirety" upon reconsideration.  (Brief in Supp. MDJ, p. 2) This statement
is incorrect.  In the April 4, 2005 Order, the court upheld the November 24,
2004 Order insofar as it dismissed the plaintiffs' claims against the claims-
made policies issued by Somerset from 1994 to 1997.  (April 4, 2005 Order, p.
1 n.1)

Circuit "will not cause any default or dismissal to be entered without first notifying opposing counsel," when the identity of counsel is known. *See* Standards of Professional Conduct Within the Seventh Federal Judicial Circuit, *available at* http://www.ca7.uscourts.gov/Rules/rules.htm#standards (last visited Sept. 20, 2005). Contrary to this rule, the plaintiffs did not first notify counsel for Mutual Marine prior to applying for default judgment. Despite the lack of notice, Mutual Marine filed an answer to the amended complaint within seven days of the plaintiffs' motion for default judgment. Under these circumstances, Mutual Marine's technical failure to file an answer has not prejudiced the plaintiffs or otherwise delayed the litigation of this case. Therefore, the motion for default judgment is denied.

## II. Motion to Strike

Federal Rule of Civil Procedure 56(e) states that affidavits filed in support or opposition to summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." In addition, Rule 56(e) requires that the affidavits be sworn and certified or otherwise made under penalty of perjury. *See Sellers v. Henman*, 41 F.3d 1100, 1101 (7th Cir. 1994); *DeBruyne v. Equitable Life Assurance Society of the United States*, 920 F.2d 457, 471 (7th Cir. 1990); *Pfiel v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). Furthermore, unsupported, conclusory statements

8

and legal arguments are not recitations of "'fact' to which an
affiant is competent to testify." *Pfiel*, 757 F.2d at 862. *See
also* ***Drake v. Minnesota Mining & Manufacturing Company***, 134 F.3d
878, 887 (7th Cir. 1998). According to the Seventh Circuit, "[a]
court must not consider parts of an affidavit that fail to meet
the standards of Rule 56(e)." ***Cooper-Schut v. Visteon Automotive
Systems***, 361 F.3d 421, 429 (7th Cir. 2004). *See also* ***Friedel v.
City of Madison***, 832 F.2d 965, 970 (7th Cir. 1987).

     The plaintiffs first argue that paragraph 15 must be strick-
en from the affidavit of Raymond Weisse as conclusory and not
based in fact. The court agrees. Paragraph 15 states: "The
delay in reporting the occurrence combined with the insured's
failure to disclose a known risk during the renewal periods has
caused prejudice to the interests of Navigator's Group, Inc.,
Somerset Marine, Inc. and New York Marine Managers." While the
defendants attempt to characterize paragraph 15 as a statement of
fact stemming from the timing of notice, the affidavit is wholly
devoid of facts that specifically show how the defendants were
prejudiced. The balance of the affidavit merely states terms of
the policies, when notice was given, that Navigator's Group (of
which Somerset is a subsidiary) has a policy of immediate re-
sponse, and that claims were made by Tanco and Wolf Lake without
backup documentation. Because a leap from these statements to a
conclusory assertion of prejudice does not comport with the
requirements of Rule 56(e), paragraph 15 is stricken. *See Pfiel*,
757 F.2d at 862.

The plaintiffs next argue that the affidavit of Dr. Allen Burton, Jr. must be stricken in its entirety because it is not notarized or made under penalty of perjury.  On September 9, 2005, this court granted the defendants ten days within which to file a notarized version of the affidavit.  The defendants timely complied on September 12, 2005.  Therefore, this argument is moot.

The plaintiffs also challenge Dr. Burton's affidavit because he lacks the necessary background to be competent on matters of environmental remediation.  This argument appears in one brief paragraph with no reference to any Federal Rule of Evidence or case law except for one citation to *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991), for the proposition that a lay witness' opinion must be based on first-hand knowledge.  The plaintiffs raise the argument again in their reply in support of their motion for summary judgment.  (Reply, p. 16) But *Visser* is irrelevant to this case because Dr. Burton is an expert, not a lay witness.  *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993) ("Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").  Thus, Rule of Evidence 702 supplies the rule of law here.

Rule 702 states:

> If scientific, technical, or other special-
> ized knowledge will assist the trier of fact
> to understand the evidence or to determine a
> fact in issue, *a witness qualified as an*
> *expert by knowledge, skill, experience,*
> *training, or education,* may testify thereto
> *in the form of an opinion or otherwise* if (1)
> the testimony is based upon sufficient facts
> or data, (2) the testimony is the product of
> reliable principles and methods, and (3) the
> witness has applied the principles and meth-
> ods reliably to the facts of the case. (em-
> phasis added)

Rule 702

Thus, Rule 702 supplies a two-part test for the admissibility of
expert testimony: first, the court must determine whether the
expert is properly qualified, and then the court must evaluate
the expert's testimony and determine whether it is relevant and
reliable. *See Dukes v. Illinois Central Railroad Company*, 934
F.Supp. 939, 947 (N.D. Ill. 1996). *See also Daubert*, 509 U.S. at
597, 113 S.Ct. at 2799. The second portion of this test requires
an application of *Daubert* and its progeny. *See, e.g., Fuesting*
*v. Zimmer, Inc.*, 421 F.3d 528, 534-35 (7th Cir. 2005). However,
because the plaintiffs object only to Dr. Burton's qualifications
and not to his methodology, reasoning, or opinions, the court
treats any objections under the second part of the Rule 702
analysis as waived.

Dr. Burton is a microbiologist with a Ph.D. in Aquatic
Toxicology and currently teaches at the Institute for Environmen-
tal Quality at Wright State University. Contrary to the plain-
tiffs' assertions that Dr. Burton has not had any experience with

11

the EPA, his curriculum vitae states that he worked for the EPA
from 1980 to 1984, led workshops regarding ecological risk on
behalf of the EPA, was a member of the EPA's Workgroup on Surface
and Groundwater Fate, Exposure and Effects of Manganese/MMT in
1991 and the EPA's Toxicity/Chemistry Workgroup from 1991-1993,
where he was active in the Assessment and Remediation of Contami-
nated Sediments Program, among numerous other accomplishments.
He also personally toured the Wolf Lake site in 2000 and prepared
three evaluations of the site between 2000 and 2003.  The court
finds that he is well-qualified to testify as to the alternatives
and effectiveness of clean-up methods and the impact of timely
detection of soil and groundwater contamination.

Finally, the plaintiffs seek to strike the July 20, 1990
Draft Compliance Evaluation Inspection Report and the January 20,
1992 Compliance Evaluation Inspection Report conducted by PRC
Environmental from the defendants' exhibit because these reports
are not properly authenticated.  In response, the defendants have
provided letters verifying that these reports are official United
States government documents obtained through the Freedom of
Information Act.  Therefore, the reports are admissible pursuant
to Rules 901(7) and 902(5).  The plaintiffs concede this point by
failing to file a reply brief.

In sum, the motion to strike is denied except with respect
to paragraph 15 of the affidavit of Raymond Weisse, which is
ordered stricken.

12

## III.  Additional Evidentiary Issues

In their reply brief in support of summary judgment, the defendants object to paragraphs 13-16 of Michael Stepanek's affidavit which the plaintiffs attached to their response brief. Although not filed as a motion to strike, the court will not exalt form over substance by declining to rule on these objections.

The defendants object to paragraphs 13 and 16 of Stepanek's affidavit as not well-grounded in fact.  Paragraph 13 states in part that upon receiving notice of the contamination at Wolf Lake and Tanco, "[n]either insurer requested documents or asked to participate in future planning for remedial activities.  Neither Insurer asked to be kept abreast of developments at the site." Paragraph 16 states in part:

> The Insurers didn't get involved . . .  The
> Insurers apparently chose not to participate
> in the investigation and remediation after
> notice and instead only issued reservation of
> rights letters.  Dr. Burton visited the Ham-
> mond Site in 2000, yet neither he nor the
> insurers attempted to ascertain additional
> facts regarding the Hammond Site or otherwise
> participate in site activities.  The Insurers
> do not identify one attempt to request more
> information or obtain a site update.

However, in the May 20, 2000 reservation of rights letter, the law firm of Beckman, Kelly, & Smith requested "all information and documentation regarding the facts and circumstances surrounding the above captioned matters, including all environmental reports and correspondence to and from any governmental agencies, insurance carriers, or other potentially responsible parties."

13

(Long Aff., Attach. 7, p. 1) Additionally, the defendants have provided a number of letters between Beckman, Kelly & Smith and plaintiffs' counsel in this case regarding Somerset's efforts to obtain documents and status reports related to the sites, determine the schedule of implementation for the 1994 Agreed Order, coordinate the July 27, 2000 site visit to Wolf Lake, and extend the deadline for entering into the 2000 consent decree with the APS "to allow further analysis by WLT's insurers." (Def. Reply Exhs. A-F)

All of these letters were sent between May 30, 2000 - four days after the May 26, 2000 written notice - and July 2000. Furthermore, Stepanek admits that Dr. Burton completed three more site evaluations after the initial July 2000 site visit. (Stepanek Aff. ∂16; Burton Aff. ∂4) Because these documents and undisputed facts contradict the assertion that Somerset failed to request information, the court will disregard the above language from paragraphs 13 and 16 of the Stepanek affidavit.[5]

The defendants also object to paragraph 14, which states that Long provided notice to the insurers in 1994, 2000, and 2003. First, the defendants argue that there is a genuine issue of material fact as to whether the 1994 notice actually occurred. (Reply p. 2) In his deposition, Long stated that he "thought" he

---

[5] As argued in the Motion to Dismiss and found by this court in the November 24, 2004 Order, Beckman, Kelly & Smith was not representing Mutual Marine at least as late as June 30, 2003. Thus, the court will not disturb Stepanek's statement that "Mutual Marine did nothing" because the defendants have not provided information showing that then-counsel for Mutual Marine made similar efforts nor any information on what action Mutual Marine took after 2003.

provided notice to Johnson & Higgins sometime in 1994, but he
could not state how that notice was made.  (Long Dep. pp. 9-10)
The court finds that divergent inferences can be drawn from this
uncertain testimony in view of the record at large, which con-
tains two affidavits from Long that omit the 1994 notification,
Weisse's affidavit that Somerset received notification in 2000,
and *written* documentation of all other notifications made to the
insurers.  Thus, a question of material fact exists as to whether
Long notified the insurers in 1994.  However, assuming that this
notice was made, the court holds that the defendants' second
argument, that "there is no assertion that any insurer or broker
ever received information about any pre-1982 claims" in the 1994
notification, must fail.  (Def. Reply Brief, p. 4) In questioning
Long during his deposition on the nature of notice given to the
defendants, defense counsel made clear that Long's statements
were in relation to the problems occurring between 1981 and 1989.
(Long Dep. p. 9) ("You said the liability occurred between '81 to
'89, okay.").

The defendants' objections to paragraph 15 of the Stepanek
affidavit are in fact arguments pertaining to the merits of this
case, and so are denied.  Similarly, the defendants' general
objection to the timbre of the Stepanek affidavit, which the
defendants characterize as a "surplusage of argument," is denied.
Beyond the sections of paragraphs 13 and 16 that the court will
not consider, the remainder of the affidavit is a statement of
Stepanek's qualifications, the history of the plaintiffs' sites

and dealings with the EPA, IDEM, and the defendants, and opinions
regarding the choices made by the plaintiffs to remediate the
contamination as well as the reasonableness of the fees and costs
incurred.   Thus, the court will consider all other portions of
the Stepanek affidavit except to the extent the affidavit creates
an issue of material fact regarding the 1994 notification.

### IV.  Motion for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), summary
judgment is proper only if it is demonstrated that "there is no
genuine issue as to any material fact and the moving party is
entitled to a judgment as a matter of law." *See Celotex Corp. v.*
*Catrett*, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548
(1986); *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir.
2004); *Branham v. Snow*, 392 F.3d 896, 901 (7th Cir. 2004); *Windle*
*v. City of Marion, Indiana*, 321 F.3d 658, 660-61 (7th Cir. 2003),
*cert. denied*, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133
(2003).   The burden is upon the moving party to establish that no
material facts are in genuine dispute, and any doubt as to the
existence of a genuine issue must be resolved against the moving
party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90
S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence*, 391 F.3d
at 841. A fact is material if it is outcome determinative under
applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Lawrence*,
391 F.3d at 841; *Hottenroth v. Village of Slinger*, 388 F.3d 1015,
1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592

16

(7th Cir. 2003).  Even if the facts are not in dispute, summary
judgment is inappropriate when the information before the court
reveals a good faith dispute as to inferences to be drawn from
those facts.  *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir.
2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th
Cir. 1990).  Finally, summary judgment "will not be defeated
simply because motive or intent are involved."  *Roger v. Yellow
Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994).  *See
also Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999);
*Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir.
1997); *United Association of Black Landscapers v. City of Milwau-
kee*, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court
must determine whether the evidence presented by the party
opposed to the summary judgment is such that a reasonable jury
might find in favor of that party after a trial.

> The inquiry performed is the threshold in-
> quiry of determining whether there is the
> need for a trial--whether, in other words,
> there are any genuine factual issues that
> properly can be resolved only by a finder of
> fact because they may reasonably be resolved
> in favor of either party.
>
> [T]his standard mirrors the standard for a
> directed verdict under Federal Rule of Civil
> Procedure 50(a), which is that the trial
> judge must direct a verdict if, under the
> governing law, there can be but one reason-
> able conclusion as to the verdict.
>
> *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
> 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d
> 202, 212 (1986)

17

*See also, Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22 (2000) (setting out the standard for a directed verdict); *Celotex Corp.*, 477 U.S. at 322-323, 106 S.Ct. at 2553; *Branham*, 392 F.3d at 901; *Lawrence*, 391 F.3d at 841; *Hottenroth*, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003) (stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

Where the parties file cross-motions for summary judgment, the court must consider each motion, and even if the parties agree that no genuine issue of material fact exists, the court can deny all motions if the parties do not establish their rights to judgment as a matter of law. *See Grabach v. Evans*, 196 F.Supp.2d 746, 747 (N.D. Ind. 2002).

On April 14, 2005, this court held that Indiana law governs the plaintiffs' claims. In Indiana, contracts for insurance are generally "subject to the same rules of interpretation as are other contracts." *Eli Lilly and Company v. Home Insurance Company*, 482 N.E.2d 467, 470 (Ind. 1985). In addition, "[t]he interpretation is 'primarily a question of law for the court, even if the policy contains an ambiguity needing resolution.'" *See Heritage Mutual Insurance v. Advanced Polymer Technology, Inc.*, 97 F.Supp.2d 913, 917 (S.D. Ind. 2000) (*quoting USA Life*

18

*One Insurance Company v. Nuckolls*, 682 N.E.2d 534, 537-38 (Ind. 1997).  The intent in an unambiguous contract is determined by the plain and ordinary terms within the four corners of the contract.  *Perfect v. McAndrew*, 798 N.E.2d 470, 479 (Ind. App. 2003); *Dempsey v. Carter*, 797 N.E.2d 268, 273 (Ind. App. 2003), *transfer denied*, 812 N.E.2d 803 (Ind. 2004).  An unambiguous contract must be enforced as written.  *See Perfect*, 798 N.E.2d at 479.

However, if a contract is ambiguous, "the language should be construed in favor of the insured and against the insurer." *Fidelity and Guaranty Insurance v. Kocolene Marketing Corporation*, No. IP 00-1106-C-T/K, 2002 WL 977855, at *4 (S.D. Ind. Mar. 26, 2002).  *See also PSI Energy, Inc. v. The Home Insurance Company*, 801 N.E.2d 705, 723 (Ind. App. 2004), *transfer denied*, 812 N.E.2d 805 (Ind. 2004) ("Any doubts as to the coverage under the policy will be construed against the insurer in order to further the policy's basic purpose of indemnity.") (internal quotation and citation omitted).  The court will find that "[a] contract is ambiguous only if reasonably intelligent people could honestly find the contract's provisions susceptible to more than one interpretation." *Dempsey*, 797 N.E.2d at 273.  A contract is not ambiguous merely because the parties disagree as to the meaning.  *Crowe v. Boofter*, 790 N.E.2d 608, 610-11 (Ind. App. 2003); *Roy A. Miller & Sons, Inc. v. Industrial Hardwoods Corporation*, 775 N.E.2d 1168, 1173 (Ind. App. 2002).

A large portion of the plaintiffs' opening brief in support
of summary judgment is devoted to a survey of environmental
insurance law and an argument that the plaintiffs' claims are for
a "personal injury" and are not outside the policies' scope by
certain exclusionary provisions.  (Pl. MSJ, pp. 5-6, 7-16) As
noted above, the occurrence based policies at issue provide
coverage for "all sums" which the plaintiffs may become obligated
to pay stemming from certain damages and expenses.  The 1980-85
policies have a "sudden and accidental" pollution exclusion, and
the 1985-94 policies have an "absolute" pollution exclusion.[6]
The policies also define "personal injury" to include "wrongful
entry or eviction, or other invasion of the right of private
occupancy."  (Long Aff. Attach. 5, 1981-82 policy ∂15) Because
the defendants do not respond to the plaintiffs' arguments that
(1) the contamination at issue falls within the definition of
"personal injury" and (2) is not excluded by either the "sudden
and accidental" or "absolute pollution exclusions under Indiana
law, the court simply notes that the plaintiffs are correct.
*See, e.g.,* ***Freidline v. Shelby Insurance Company***, 774 N.E.2d 37
(Ind. 2002); ***Kiger v. Commissioner, Indiana Department of Envi-***
***ronmental Management***, 662 N.E.2d 945 (Ind. 1996); ***Travelers***

---

[6] The 1981-82 policy specifically excludes "Bodily injury or property
damage including clean-up and containment costs arising out of the discharge,
dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis,
toxic chemicals, liquids or gases, waste materials or other irritants,
contaminants or pollutants into or upon the land, the atmosphere or any
watercourse or body of water; but this exclusion does not apply: (1) if such
discharge, dispersal, release or escape is <u>sudden and accidental</u> . . . . (Long
Aff. Attach. 5, 1981-82 policy at ∂4(I) (emphasis added).  By contrast, the
1986-87 policy simply excludes "<u>any claim</u>" arising out of such activities.
(Long Aff. Attach. 5, 1986-87 policy at ∂4(I) (emphasis added).

*Indemnity Company v. Summit Corporation of America*, 715 N.E.2d
926 (Ind. App. 1999).  Despite these concessions by the defen-
dants, the plaintiffs still must show that the contamination
occurred during the relevant policy period in order to establish
that the policy actually was triggered.  *See* *PSI Energy*, 801
N.E.2d at 732 n.25.

Indiana courts apply an "injury in fact" rule to determine
when coverage is triggered under an occurrence based insurance
policy.  *See* *PSI Energy*, 801 N.E.2d at 733; *Allstate Insurance
Company v. Dana Corporation (Dana II)*, 759 N.E.2d 1049, 1060-61
(Ind. 2001).  This approach "implicates all of the policy period
during which the *insured proves* some injury or damage." *PSI
Energy*, 801 N.E.2d at 732 n.25 (emphasis added) (internal cita-
tion and quotation omitted); *Dana II*, 759 N.E.2d at 1057 (noting
that an "occurrence" under CGL policies "may take place over
time").  However, the insured is not required to show that *new*
releases of contaminants occurred during each policy period for
coverage to attach under consecutive policies that define "occur-
rence" to include injuries resulting from "continuous and re-
peated exposure" to "substantially the same conditions," such as
the policies do here.  *PSI Energy*, 801 N.E.2d at 733-34; (Long
Aff. Attach. 5, 1981-82 policy $\partial$14) Rather, the insured must show
that the "subjectively unexpected and unintended contamination
*continued to cause* damage during the relevant policy periods."
*PSI Energy*, 801 N.E.2d at 734 (emphasis added).  In addition,
under a policy covering "all sums," "if coverage is triggered by

21

an occurrence, it is triggered for 'all sums' related to that occurrence." *Dana II*, 759 N.E.2d at 1058.  Finally, *Dana II* permits an insured to select one or more triggered policies to cover the entirety of a loss that occurred over multiple policy periods in order to avoid the application of multiple deduct-ibles.  *See* 759 N.E.2d at 1058.  In other words, a plaintiff seeking indemnity under the first policy during which the conta-mination allegedly occurred has the burden to show that the contamination began during the particular time period covered by the policy, but thereafter the plaintiff need only show that the injury caused by the contamination continued through the subse-quent policy periods at issue to trigger those policies.

For purposes of summary judgment, the plaintiffs have chosen to pursue all of their claims under the 1981-82 Mutual Marine policy.  (Pl. MSJ, p. 14 n.10) Thus, the plaintiffs must show that the "occurrence" for which they seek coverage began or was continuing to cause damage between April 1, 1981 and April 1, 1982 at both the Tanco and Wolf Lake sites.  *PSI Energy*, 801 N.E.2d at 732 n.25.  With respect to Tanco, the plaintiffs offer the affidavit of Ewell Long, who states that Tanco operated the Wisconsin site from 1981 to 1993 and that in 1993, the Wisconsin DNR "demanded that Tanco fund or participate in the necessary environmental response for what had occurred at the Milwaukee Site" during this time period.  (Long Aff. ∂5) The defendants do not offer any evidence to contradict this assertion, and so the plaintiffs have met their burden to establish that the triggering

22

event at the Wisconsin site "occurred" during the 1981-82 policy. *See* Rule 56(e).

With respect to Wolf Lake, Long states that tanks 23 and 26 were being used by Rapid Liquids and tanks 31, 32, and 37 were being used by FEC between 1981 and 1982. (Long Aff. $\partial$3; Long Supp. Aff. $\partial$3) The plaintiffs also offer the affidavit of Michael Palm, a geologist, who states that contamination occurred at these tanks "during each of the years (late 1970's to 1985) that the affected tanks were being used for blending operations." (Palm Aff. $\partial$9)

The defendants attempt to create a factual issue as to when the contamination from these tanks began by arguing that Long's affidavit, the 1994 Agreed Order with IDEM, and various other exhibits fail to link the contamination at Wolf Lake specifically to the 1981-82 time period. (Def. Response, pp. 19-20) Rule 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

As required by Rule 56, the defendants have not provided counter-vailing evidence to refute the plaintiffs' claims with respect to tanks 23, 31, 32, and 37, and so the court finds that the contamination was occurring at and around these tanks during the 1981-82 policy period.

23

However, the court finds that a genuine issue of material fact exists as to when the contamination began at tank 26.  The July 20, 1990 PRC Compliance Evaluation Inspection of the Wolf Lake Site states that soil samples described in a June 3, 1987 report by Ecology & Environment "showed hazardous compounds in the soil around Tank No. 24, which is adjacent to Tank No. 26; sharing the same diked secondary containment area."  The contaminants found were trichloroethene, tetrachloromethane, arsenic, chromium, cyanide, and lead.  (Response Brief, Exh. G, at p. 5) Following PRC's own inspection on June 6, 1990, PRC reported that "PRC inspected the area surrounding Tank No. 26 and found no evidence of a spill on the stones and ground surface around the tank."  (Response Brief Exh. G, p. 6) These reports create a question regarding whether the contamination at tank 26 began by April 1, 1982.  The parties have not stipulated to a definition of "occurrence," which could be characterized as corresponding to an individual tank, to all tanks leased by a certain lessee, to all tanks owned by Wolf Lake, or even to all contamination at both the Tanco and Wolf Lake sites.  Nor have the parties articulated their own positions on this question, although they are most certainly adverse in light of the briefing on the question of the triggering event.  In addition, neither party has provided any information regarding whether the contaminants found around tank 24 in 1987 were characteristic of the materials stored in that tank or in tank 26.  For these reasons, the court finds that summary judgment cannot be granted in favor of either party on

24

the question of whether the 1981-82 policy was triggered with respect to tank 26.[7]  Having determined that the 1981-82 policy was triggered with respect to the remaining Wolf Lake tanks and Tanco site, the court turns to the additional defenses raised by the defendants in the cross-motions for summary judgment.

First, the defendants briefly argue that the "known loss" doctrine bars the claims made by Wolf Lake.  The known loss doctrine prevents an insured from obtaining insurance coverage of a loss the party actually knew already had taken place.  *See* ***General Housewares Corporation v. National Surety Corporation***, 741 N.E.2d 408, 413 (Ind. App. 2000).  Under this doctrine, "the burden of proving that the loss was known is on the party seeking to avoid coverage." ***General Housewares***, 741 N.E.2d at 414. Here, the defendants argue that the known loss doctrine prevents Wolf Lake from seeking indemnity on any policies later than 1989, when the EPA and IDEM first notified Wolf Lake of violations regarding the tanks.  However, this doctrine is irrelevant to indemnity under the 1981-82 policy because the uncontroverted facts establish that Wolf Lake had no notice of contamination in

---

[7] In so holding, the court rejects the plaintiffs' argument that the "all sums" coverage provision in paragraph 3(b) of the 1981-82 policy does not require an "occurrence" to take effect because that provision does not explicitly include the term.  While that particular clause does not mention an "occurrence," the policy is replete with the term.  More importantly, to the extent this argument suggests that the policy covers occurrences *not yet begun* during the policy period, the court finds that such a holding would contravene the plaintiffs' obligation to establish the triggering event.  *See* ***PSI Energy***, 801 N.E.2d at 732 n.2.  Even under the "personal injury" coverage provision, which the plaintiffs argue does not require an "occurrence" during the policy period, the plaintiffs concede that the provision "denotes a state of violation or an offense which is satisfied *by either initiation or continuation* of the contaminated condition."  (Pl. Reply, p. 21) (emphasis added).

tanks 23, 26, 31, 32, and 37 when that policy was purchased.  The defendants have not provided any contrary evidence to prove Wolf Lake's actual knowledge of contamination at that time so their argument under the known loss doctrine fails.

Next, the defendants argue that the plaintiffs' claims are barred by the doctrine of laches, which is really a "late notice" defense in the context of CGL insurance.  *See* **PSI Energy**, 801 N.E.2d at 715-16; **Askren Hub States Pest Control Services, Inc. v. Zurich Insurance Company**, 721 N.E.2d 270, 277-79 (Ind. App. 1999).  In Indiana, the notice requirement of an insurance policy is "material, and of the essence of the contract."  **Miller v. Dilts**, 463 N.E.2d 257, 265 (Ind. 1984) (*quoting* **London Guarantee and Accident Company, Ltd. v. Siwy**, 66 N.E.2d 481, 482 (Ind. App. 1904)).  The purpose of prompt notice is to give "the insurer an opportunity to make a timely and adequate investigation of all the circumstances surrounding the accident or loss."  **Miller**, 463 N.E.2d at 265.  Without notice, the insurance company has no liability to the insured.  *See* **PSI Energy**, 801 N.E.2d at 715-16.

Under the late notice defense, the insured first must show that it provided "reasonable notice" to the insurer.  **Askren**, 721 N.E.2d at 277-78.  Although occasionally a question of fact, "*[w]hen the facts are not in dispute,* what constitutes reasonable notice is a question of law for the court to decide."  **Askren**, 721 N.E.2d at 278 (emphasis added).  If the notice is unreasonable, a presumption arises that the insurer actually has been prejudiced by the untimely notice.  *See* **Miller**, 463 N.E.2d at

265; *PSI Energy*, 801 N.E.2d at 715 n.7.  However, the insured may rebut this presumption by showing "some evidence that prejudice did not occur in the particular situation" in order to make the issue a question for the trier of fact.  *Miller*, 463 N.E.2d at 265-66.

Three observations are necessary to narrow this issue as it stands before the court.  First, the 1981-82 policy has a notice provision which states:

> It is further stipulated and is a considera-
> tion of this insurance that in the event of
> an occurrence which may result in loss, dam-
> age, injury or expense, for which these As-
> surers are or may become liable under this
> insurance, notice thereof shall be given to
> Johnson & Higgins *as soon as practicable*, and
> further that any and every process, pleading
> and paper of any kind relating to such occur-
> rence shall be forwarded promptly to Johnson
> & Higgins, if requested. (emphasis added)

(Long Aff. Attach. 5, 1981-82 Policy ∂9)

Indiana courts interpret the phrase "as soon as practicable" to require "reasonable notice."  *Askren*, 721 N.E.2d at 278 n.7.

Second, the litany of case cites provided by the defendants to argue prejudice by unreasonably late notice primarily are cases involving automobile accidents and personal injury.  (Def. MSJ, pp. 3-4) Indiana courts interpreting CGL policies repeatedly have stated that automobile and personal injury cases are distin-guishable from environmental cases on the issue of late notice, so the court will not consider the cases offered by the defendant that do not address environmental liability.  *See Miller*, 463 N.E.2d at 265; *PSI Energy*, 801 N.E.2d at 717.

27

Third and most significantly, the defendants do not chal-
lenge the notice Tanco provided to the insurers.  It is undis-
puted that the DNR notified Tanco of the contamination at the
Wisconsin site on November 10, 1993, and that Tanco notified
Johnson & Higgins of this fact on January 31, 1994, approximately
two and one-half months later.  Although the defendants suggest
that Tanco's subsequent withdrawal of its request for defense and
indemnification creates an issue of material fact in their
statement of genuine issues, the defendants do not raise this
argument in any of their briefs on either motion for summary
judgment.  Because the court will not develop arguments on behalf
of a party, the court finds that Tanco's 1994 notification to
Johnson & Higgins was timely and will not consider the impact of
the subsequent withdrawal.  *See* *Tyler v. Runyon*, 70 F.3d 458,
464-65 (7th Cir. 1995); *Hershinow v. Bonamarte*, 735 F.2d 264, 266
(7th Cir. 1984).  With these conclusions in place, the court
turns to the remaining issue of the defendants' notice of conta-
mination at the Wolf Lake site.

At least two factual issues preclude the court from deter-
mining whether Wolf Lake's notice was reasonable as a matter of
law.  *See* *Askren*, 721 N.E.2d at 278.  As stated earlier, the
record is not clear as to whether the defendants received notice
of Wolf Lake's claims in 1994.  As a practical matter, the court
cannot determine whether notice was reasonable when the timing of
that notice is in dispute.  In the alternative, the plaintiffs
argue that the defendants had notice of Wolf Lake's claims

28

through annual visits Johnson & Higgins made to the site.  The
plaintiffs are attempting to compare the facts at bar to the
facts of other cases in which some form of actual, albeit nontra-
ditional, notice had been proven or to cases in which construc-
tive notice was adequate on an issue of fact that was not "pecu-
liarly within the knowledge of the insured." *Johnson v. Payne*,
549 N.E.2d 48, 51-52 (Ind. App. 1990). *See also, e.g., **Franken-
muth Mutual Insurance Company v. Williams***, 645 N.E.2d 605, 607-08
(Ind. 1995) ("[A]n insurance company which investigates a claim
by an injured third party against its insured has notice of a
lawsuit by the injured third party against its insured when it
receives such a subpoena and a request to produce a copy of the
policy it sold to its insured."); *Globe & Rutgers Fire Insurance
Company v. Indiana Reduction Company*, 113 N.E. 425, 428 (Ind.
App. 1916) (insurance company could not avoid indemnification on
the basis of gasoline at the insured's premises when an agent was
informed of the presence of gasoline).

The extent of the evidence regarding Johnson & Higgins' site
visits is Long's deposition testimony that Johnson & Higgins
"made an inspection, and they looked at our books, monitored our
through-put."  (Long Dep. p. 10) Long further testified that
these activities were unrelated to any actions by IDEM and the
EPA.  (Long Dep. p. 11) The plaintiffs have not shown that Wolf
Lake actually informed a Johnson & Higgins agent of the contami-
nation, nor have they put forth any evidence to show the extent
of the yearly monitoring activities, whether these activities

could reveal soil or groundwater contamination, or whether they in fact did.  To say that Johnson & Higgins should have or could have discovered contamination on the basis of these facts extends *Johnson, Frankenmuth*, and *Globe & Rutgers* too far.  The court declines to find notice as a matter of law on the basis of such limited information, particularly when the plaintiffs carry the burden to show reasonable notification.  *See Askren*, 721 N.E.2d at 277-78.  Nevertheless, these factual issues are not fatal to the plaintiffs' claims.

Even if the timing of notice is unreasonable, insurers seeking to avoid liability on the late notice defense must show that they actually were prejudiced by the late notice in order to survive summary judgment in the insured's favor once the insured has put forth evidence that no prejudice occurred.  *See Erie Insurance Exchange v. Stephenson*, 674 N.E.2d 607, 612 (Ind. App. 1996) (noting that the insured can present evidence "to rebut the presumption of prejudice as a matter of law.");  *Accord Shell Oil Company v. Winterhur Swiss Insurance Company*, 15 Cal. Rptr.2d 815, 845-46 (Cal. App. 1993);  *Sherwin-Williams Company v. Certain Underwriters at Lloyd's London*, 813 F.Supp. 576, 588-89 (N.D. Ohio 1993);  *Maryland Casualty Company v. Wausau Chemical Corporation*, 809 F.Supp. 680, 694 (W.D. Wis. 1992).  The presumption of prejudice is rebutted by evidence that the insureds "adequately safeguarded the [insurers'] interests by assuming the defense" of the contamination claims.  *Sherwin-Williams*, 813 F.Supp. at 589.  Similarly, the presumption can be rebutted by evidence that the

30

insurer actually made no effort to investigate the contamination
or otherwise participate in the underlying negotiations towards
remediation, even when the insurer generally argues that it could
have done these things. *Wausau,* 809 F.Supp. at 694. *See also*
*Shell Oil*, 15 Cal. Rptr.2d at 845 ("[P]rejudice is not shown
simply by displaying end results; the probability that such
results could or would have been avoided absent the claimed
default or error must also be explored.") (citation and quota-
tions omitted).  When an insurer takes no action beyond an
assertion that the underlying claim is not covered by the policy,
no prejudice has occurred by late notice because "earlier notice
would only result in an earlier denial of coverage." *Shell Oil*,
15 Cal. Rptr.2d at 846.

Because the plaintiffs have elected to pursue their claims
under the Mutual Marine 1981-82 policy, the court's analysis of
prejudice for purposes of these summary judgment motions must
focus on Mutual Marine's response to the notice provided by Tanco
and Wolf Lake.  *See* *PSI Energy*, 801 N.E.2d at 716-17 (noting that
the reasonableness of notice must be determined in view of which
insurers are potentially liable). *See also* *Dana II*, 759 N.E.2d
at 1058 (allowing the insureds to seek indemnification under one
or more triggered policy).  Here, the undisputed facts show that
Mutual Marine made no response either to Tanco's January 31, 1994
notification to Johnson & Higgins or Tanco's withdrawal of this
notice seven months later on August 2, 1994.  (Long Aff. ∂8) The
defendants have put forth no evidence showing that Mutual Marine

made any effort to inquire about, become involved in, or even assert its rights with respect to the remediation efforts at the Tanco facility until this lawsuit.  Accordingly, the court finds that Mutual Marine was not prejudiced by the timing of Tanco's notice and therefore has the duty to pay defense costs and indemnify Tanco on the contamination claims.

The court also finds that Mutual Marine must pay defense costs and indemnify Wolf Lake.  Mutual Marine did not respond to Wolf Lake's June 8, 2000 notification until October 25, 2000, nearly four months later.  In the October 2000 response, Mutual Marine reserved its rights under the policies "after receiving further information from Wolf Lake and completing its investiga-tion." (Long Aff. Attach. 8) Mutual Marine did not request further information in this letter or any other documents on record, nor is there any evidence that it completed an investiga-tion.  The only evidence the defendants have offered to counter the plaintiffs' assertion that Mutual Marine was not prejudiced is the affidavit of Raymond Weisse, the Chief of Asbestos and Environmental Claims for Navigators Group, an entity unrelated to Mutual Marine, and the affidavit of Dr. Burton, who simply states that had the contamination been discovered earlier, certain steps "likely" could have been taken.

The court already has stricken the bald assertion of preju-dice from Weisse's affidavit.  Furthermore, general statements of actions made possible by early detection do not satisfy Mutual Marine's obligation to show that those steps in fact would have

32

been taken or would have achieved different results, particularly when the evidence on record shows that Mutual Marine actually did nothing beyond reserve its rights under the policies. *Shell Oil*, 15 Cal. Rptr.2d at 745; *Wausau*, 809 F.Supp. at 694.  Although the defendants argue in their motion for summary judgment that Slager, the owner of Rapid Liquid Waste, is a "crucial witness to the events surrounding the WLT tank occurrences," and that his death has prejudiced the defendants, they have offered no evidence to suggest what information Slager might have possessed or how this information might have impacted the remediation of the claims against the plaintiffs.  Finally, the court notes that both plaintiffs assumed the defense of the claims against them and negotiated remedies.  (Stepanek Aff. ∂∂15, 19) Consequently, the court finds that Mutual Marine also was not prejudiced by the timing of Wolf Lake's notice.

Finally, the plaintiffs argue that they are entitled to prejudgment interest.  In Indiana, "an award of prejudgment interest in a contract action is warranted if the amount of the claim rests upon a simple calculation and the terms of the contract make such a claim ascertainable." *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1140 (Ind. App. 2002) (*citing J.S. Sweet Company, Inc. v. White County Bridge Commission*, 714 N.E.2d 219, 225 (Ind. App. 1999)).  Thus, "[t]he test for determining whether an award of prejudgment interest is appropriate is whether the damages are complete and may be ascertained as of a particular time." *Ward*, 760 N.E.2d at 1140.  The award generally

33

is not considered a matter of discretion and is proper if the
"trier of fact need not exercise its judgment to assess the
amount of damages." *J.S. Sweet*, 714 N.E.2d at 225; *Dale Bland
Trucking, Inc. v. Kiger*, 598 N.E.2d 1103, 1106 (Ind. App. 1992).

The applicable statutes for determining prejudgment interest
rates in breach of contract cases in the absence of an agreement
are Ind. Code ß24-4.6-1-102 and Ind. Code ß24-4.6-1-103.  Accord-
ing to Ind. Code ß24-4.6-1-102, "[w]here the parties do not agree
on the rate, interest on loans or forbearances of money, goods or
things in action shall be at the rate of eight percent (8%) per
annum until payment of judgment."  Ind. Code ß24-4.6-1-103 gives
the date from which interest is allowed: "From the date of
settlement on money due on any instrument in writing which does
not specify a rate of interest . . . ."  Ind. Code ß24-4.6-1-
103(a).  The Indiana Court of Appeals has made clear that this
section means that prejudgment interest should be calculated from
the time at which it was due stating that "[w]here the terms of
the contract make the claim ascertainable and the amount of the
claim rests upon mere computation, pre-judgment interest computed
from the time the principal amount was demanded or due is allow-
able at the permissible statutory rate."  *Town & Country Mutual
Insurance Co. v. Savage*, 421 N.E.2d 704, 709 (Ind. App. 1981)
(*citing Indiana Telephone Corp. v. Indiana Bell Telephone Co.*,
358 N.E.2d 218, 229 (Ind. App. 1976)) (emphasis added).  *See also
Blue Valley Turf Farms, Inc. v. Realestate Marketing & Develop-
ment*, 424 N.E.2d 1088, 1091 (Ind. App. 1981).

In support of their claim for prejudgment interest, the
plaintiffs offer the affidavit of Shay Recla, who offers a
summary of invoice dates and amounts, dates paid, days that have
passed since each invoice was paid, and the interest on each
invoice to date.  (Shay Recla Aff. Attach. 1 & 2) According to
Recla, the total defense costs at Wolf Lake prior to deductions
and without the addition of prejudgment interest was $74,817.75
and at Tanco was $52,624.11.  (Recla Aff. $\partial\partial$4, 8) The cost of
remediation at Wolf Lake was $220,510.95 and at Tanco was
$26,777.24 prior to deductions and before interest.  (Recla Aff.
$\partial\partial$6, 10) The remediation at Tanco appears to have closed, and the
Wolf Lake site will not be the subject of further environmental
response activities if the EPA accepts a closure request cur-
rently pending before the agency.  (Long Aff. $\partial$4) Stepanek's
affidavit states that all fees and costs associated with the two
sites appear reasonable.  (Stepanek Aff. $\partial$20).

The defendants have not offered any evidence to support
their position that the fees are unreasonable or cannot be
ascertained.  Instead, the defendants assert the same arguments
already rejected by the court pertaining to the merits of this
case.  In addition, the defendants argue that sums paid to
Attorney Peter Manous should not be compensable.  In particular,
the defendants object to sums paid for Attorney Manous related to
the property sale, leasing, and tax issues surrounding the
creation of Rapid Fluids, Inc.  (Def. Resp. Brief p. 16) Beyond
the defendants' failure to provide any admissible evidence to

substantiate its arguments, the court notes that the undisputed evidence establishes that Wolf Lake created Rapid Fluids, Inc. as part of the remediation plan to contain Wolf Lake's liability for the contamination.  (Long Dep. pp. 22-28; Stepanek Aff. ∂20) Furthermore, Stepanek's uncontroverted affidavit states:

> Similarly, the fees and costs associated with creating a separate corporate entity (Rapid Fluids) to segregate a particular location within a vast commercial storage facility, thereby reducing the size of the site to the actual area of contamination was not only reasonable, but logical.  This segregation effort was in fact successful in that the EPA subsequently agreed to limit its scope of investigation to the actual area of contamination, saving extensive unnecessary investigative costs for the client, and Insurers.

> (Stepanek Aff. ∂20)

Given the lack of any evidence to the contrary, the court finds that prejudgment interest is appropriate in this case.

However, the court cannot award prejudgment interest at this time because two outstanding issues must be resolved before a sum certain can be ascertained.  First, the parties dispute which deductible should be applied to the environmental remediation costs.  The plaintiffs assume that the $25,000 per occurrence deductible applies and have tendered their calculations of prejudgment interest on this presumption.  (Recla Aff. ∂∂6, 10) In response, the defendants argue that the $75,000 pollution deductible applies to the claims, but the defendants cite no law in support of their position.  (Def. Resp. p. 15) The plaintiffs fair no better because they ignore the defendants' argument

36

entirely in reply.  As the court already has stated, the court
will not develop arguments on behalf of either party or resolve
an issue that has not been briefed.  Second, a question of fact
still remains as to whether the contamination at tank 26 had
begun by April 1, 1982 (or whether this contamination simply
should be considered part of the same "occurrence" already
occurring at tanks 23, 31, 32, and 37 during the policy period)
and thus whether the costs and fees associated with that tank can
be recouped under the 1981-82 policy.  As these issues prevent
the court from reaching an otherwise straightforward interest
calculation, the court cannot enter an award of prejudgment
interest at this time.

In sum, the court finds that the defendants must compensate
the plaintiffs for the defense and remediation costs incurred at
Tanco's Wisconsin site and Wolf Lake with respect to tanks 23,
31, 32, and 37 under the 1981-82 Mutual Marine occurrence based
insurance policy.  However, a genuine issue of material fact as
to when the contamination began at tank 26 precludes a determina-
tion as a matter of law that the defendants must reimburse the
costs associated with that tank.  In addition, although prejudg-
ment interest is otherwise readily calculable in this case, the
question regarding tank 26 and the remaining dispute over the
appropriate deductible preclude an award of interest at this
time.  The court further notes that an application of the $75,000
deductible to Tanco's claims could vitiate the defendants'

37

liability to Tanco in its entirety, as those claims fell below the amount of that deductible.

————————————

For the foregoing reasons, the Updated Motion for Summary Judgment filed by the plaintiffs, Wolf Lake Terminals, Inc. and Tanco Terminals, Inc., on April 14, 2005 is **GRANTED IN PART** and **DENIED IN PART;** the Motion For Summary Judgment filed by the defendants, Mutual Marine Insurance Company and Somerset Marine, Inc., on May 16, 2005 is **GRANTED IN PART** and **DENIED IN PART;** the Motion for Default Judgment against Defendant Mutual Marine Insurance Company filed by Wolf Lake and Tanco on June 21, 2005 is **DENIED;** and the Motion to Strike Affidavits and Exhibits Submitted by Defendants in Opposition to Plaintiffs' Motion for Summary Judgment filed by Wolf Lake and Tanco on June 21, 2005 is **GRANTED IN PART** and **DENIED IN PART.**

ENTERED this 28th day of November, 2005

                    s/ ANDREW P. RODOVICH
                       United States Magistrate Judge